IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGIE JOHNSON,<br>    Plaintiff<br><br>        v.<br><br>RESOURCES FOR HUMAN<br>DEVELOPMENT, INC., et al.,<br>    Defendants | :<br>:<br>:   CIVIL ACTION<br>:<br>:   NO. 09-3664<br>:<br>:<br>: |

May _16___, 2011                                                                                  Anita B. Brody, J.

**MEMORANDUM**

Plaintiff Angie Johnson ("Johnson") brings this action against her former employer, Resources for Human Development, Inc. ("RHD"), and its Executive Director, Robert Fishman ("Fishman"). Johnson claims that Defendants terminated her in retaliation for her engaging in an activity protected by the state whistleblower law and that Defendants violated her federal rights under the Family and Medical Leave Act ("FMLA"), 26 U.S.C. § 2601 *et seq*.[1] Defendants move for summary judgment on all counts. Defs.' Mot. Summ. J., ECF No. 40. For the reasoning explained below, I will grant in part and deny in part Defendants' Motion.

---

[1] Jurisdiction is exercised under 28 U.S.C. § 1331 for the FMLA claim and under 28 U.S.C. § 1367 for the state law claims.

1

# I. BACKGROUND[2]

Defendant RHD is a nonprofit corporation that sponsors human services programs in over eleven states. *Id.* Ex. D. For the eight years preceding her termination, Plaintiff Johnson was the director of RHD's Adolescent Career and Employment Services ("ACES") program. ACES provided training for at-risk youth aged sixteen to twenty-one on how to find, secure, and retain employment. *See id.* Ex. A. The program received funding from the City of Philadelphia Department of Human Services ("DHS"). Hales-Slaughter Dep. 22:5-14, Oct. 6, 2010.

On a Friday in July 2004, Johnson and a group of RHD coworkers had a birthday celebration. Johnson Dep. 126-128, Aug. 20, 2010. At the meal, a coworker joked to Johnson that she was "'going to be a grandmother.'" *Id.* at 128:1-2. The coworker explained that Sherone Daniels ("Daniels"), an employee in RHD's Central Office, "was having a baby by Keith" ("Jenkins"), an ACES consumer. *See id.* at 128:7-9. That Monday morning, Johnson shared the rumor with her then-supervisor, Monique Hales-Slaughter ("Hales-Slaughter"). Johnson "wanted to let her know we needed to investigate" because Johnson believed the rumored behavior constituted "inappropriate conduct" prohibited by RHD's policy about employees' relationships. *Id*. at 157:17-158:23.

Hales-Slaughter arranged a telephone call that afternoon with her supervisor, Marsha O'Hara ("O'Hara"), and Johnson to discuss the matter. A larger meeting was held the next day with Johnson, Hales-Slaughter, O'Hara, Fishman, and Daniels. At this meeting, Johnson

---

[2] Where disputed, the facts are stated in the light most favorable to the Plaintiff. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) ("[T]he court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor.").

expressed that Daniels's behavior was also inappropriate because Daniels was "[h]aving sex with a consumer that was underage." *Id.* at 164:4-5; *see id.* at 155:3-14.[3] In Johnson's account of the meeting, she and Hales-Slaughter insisted that Daniels had violated company policies while Fishman argued that it was not a violation and "that they were two consensual adults who had sex."[4] *Id.* at 164:14-18. Johnson did not report her suspicions about Daniels to the police, DHS, Jenkins's probation officer, or Jenkins's parents. *Id.* at 158:2-13. There is nothing in the record that shows Johnson's report was further discussed by or with Johnson after this July 2004 meeting.

In 2005, Johnson inquired about the director position for the new E3 program but was told it had already been filled. *Id.* at 114:9-10. She was frustrated because, she says, "we didn't know about the applications or the position, nobody ever told [sic] about the interview." *Id.* at 114:7-9. That same year, Johnson heard about a director position for a community reintegration program. Again she inquired and was told that it was already filled. *Id.* at 116:5-117:5. Both director positions were listed in a Human Resources bulletin of in-house job listings that was

---

[3] Johnson appears to use the term "underage" to denote all individuals between the ages of sixteen and twenty-one years old. Johnson Dep. 136:16 (stating that she "knew he was a minor because our program was 16 to 21"), 137:3-6 (stating that she only knew that Jenkins was between the ages of sixteen and twenty-one); *see also id.* 136:3-5 (stating that, at time of reports, she did not know Jenkins's date of birth); 136:6-13 (providing an unresponsive answer to question of whether she looked at any information that included Jenkins's date of birth).

[4] Hales-Slaughter describes the meeting as a discussion of whether or not the relationship was improper: whether Jenkins was old enough to make an informed adult decision and whether RHD had any responsibility to report anything to DHS. Hales-Slaughter Dep. 32:3-7. Hales-Slaughter testifies that at the meeting the group determined that there was no responsibility to report the relationship because Jenkins was no longer a consumer and because the sexual relationship began when Jenkins was eighteen years old. *Id.* at 32:12-25.

3

posted at the RHD Central Office and placed in employees' mailboxes. *Id.* at 119:10-120:22. Johnson states that she does not believe anyone prevented her from obtaining the positions. *Id.*; Pl.'s Resp. Mot. Summ. J. 6, ¶¶ 18, 22, ECF No. 46. When the other positions were filled, Johnson received a salary increase to make her salary the same as the new directors. Hales-Slaughter Dep. 25:14-26:9; Pl.'s Resp. Mot. Summ. J. 7, ¶¶ 23-24.

In summer 2007, Jennifer Arthur-Lewis ("Arthur-Lewis") became Johnson's direct supervisor. On Arthur-Lewis's first day, she told Johnson that the management team said Johnson needed to be under strict supervision. Johnson Dep. 182:10-13, 201:10-202:14. In early August, Arthur-Lewis admonished Johnson for continuing to engage Johnson's previous supervisor regarding daily issues at ACES, rather than following Arthur-Lewis's directives. *Id.* at 187:12-20; *see* Defs.' Mot. Summ. J. Ex. P. Defendants offer additional testimony that Johnson was scolded by multiple supervisors for other problems such as unexcused absences from work and communication problems with staff. *E.g.*, Arthur-Lewis Dep. 33:17-34:23, 39:11-44:21, July 21, 2010; Gunter Dep. 27:13-19, 83:15-91:21, 141:3-20, Sept. 2, 2009. Johnson denies both the behavior underlying these allegations and that her supervisors ever addressed these issues with her.

In fall 2008, DHS considered suspending its funding for the ACES program due to the City's budgetary problems.[5] In December 2008, Fishman told Gunter and Arthur-Lewis that he wanted to meet with Johnson personally due to the problems they had been having with her.

---

[5] Arthur-Lewis testifies that, around that same time, she began suggesting to her supervisors, Fishman and Associate Director Richelle Gunter, that they consider terminating Johnson for mismanaging ACES. Arthur-Lewis Dep. 45:10-25.

Fishman Dep. 42:1-10, July 21, 2010. On December 8, 2008, Fishman met with Johnson; Gunter and Arthur-Lewis also attended. Johnson Dep. 182:15-21, 225:1-7. At the meeting, Fishman confronted Johnson about why she was absent from work on a particular day in November 2008. *Id.* at 216:7-217:19. Johnson said that she was at a doctor's office. Fishman suspected that Johnson was lying. Fishman told her to provide the doctor's name and phone number so that her visit could be verified, and he warned her that if she did not do so by the end of the day he would issue an instruction to others to dismiss her. *Id.* at 221:22-222:3; Fishman Dep. 29:23-31:3, 34:11-22. Johnson failed to provide Fishman with the information by the end of the day. Johnson Dep. 222:4-5; Fishman Dep. 31:2-3.

Later that same day, Plaintiff visited a medical provider due to anxiety. Johnson Dep. 234:7-24. The next morning, Johnson called her supervisors and Fishman to inform them that she would be out from work sick.[6] That day, Human Resources approved her for FMLA leave. *Id.* at 241:16-24; Defs.' Mot. Summ. J. Ex. S. One of the FMLA forms she was given stated that her current position fell within the FMLA definition of a "key employee" and "[a]ccordingly, if it is determined that there is a need to replace your functions during your absence, RHD is permitted to do so under FMLA." Defs.' Mot. Summ. J. Ex. U; Johnson Dep. 242:13-15. Johnson's duties were temporarily taken over by Arthur-Lewis's assistant. Arthur-Lewis Dep. 12:1-13. In January 2009, RHD hired someone to fill Johnson's position permanently as the director of ACES. *Id.* at 60:19-61:6.

---

[6] Fishman claims that he recommended his staff terminate Johnson's employment due to her failure to provide information by the end of the previous day, but that his staff did not take action because Johnson left on FMLA leave. Fishman Dep. 35:14-18, 36:22-37:3.

5

On February 23, 2009, Johnson visited RHD to inform them that she was cleared to return to work a week early, on February 25. Johnson's supervisor, Arthur-Lewis, was not in the office at the time, and Arthur-Lewis's supervisor, Gunter, informed Johnson that she had been terminated. Johnson Dep. 249:10-13, 252:4-10; Gunter Dep. 59:5-60:15. Gunter gave Johnson a letter stating that because she was a key employee, RHD did not hold her position open for her and she had been replaced. Defs.' Mot. Summ. J. Ex. X; Johnson Dep. 263:2-10. The letter further stated that "RHD has chosen to declare you ineligible for rehire within the company" due to "behavioral issues in the months and days preceding your disability leave." Defs.' Mot. Summ. J. Ex. X.

## II. Legal Standard

Summary judgment is appropriate only if the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on that claim or defense. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the case under governing law. *Id.*

The moving party bears the initial responsibility of identifying the basis for its motion and portions of the record which demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To oppose the motion, the nonmoving party must show that a fact is genuinely disputed by citing to the record or showing that the materials cited by the moving party do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Summary judgment may be granted if the nonmoving party fails to respond with a factual

6

showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

**III. DISCUSSION**

Plaintiff asserts three causes of action against Defendants: (a) a retaliatory discharge claim under the Pennsylvania Whistleblower Law ("Whistleblower Law"), (b) a common law wrongful discharge claim, and (c) a Family Medical Leave Act ("FMLA") claim. Defendants move for summary judgment on all claims.

### A. Pennsylvania Whistleblower Law

Plaintiff claims that she reported wrongdoing by a coworker and that her subsequent termination was in retaliation for this report. She argues that her report was protected activity under the Whistleblower Law, and that her termination therefore violates the law. *See* Compl. ¶ 33, ECF No. 1.

The Whistleblower Law seeks to protect public employees who report suspected legal violations from being discharged by their employers as a result of such reporting. 43 Pa. Stat. Ann. § 1423(a). To state a cause of action under the Whistleblower Law against an eligible employer,[7] an employee "must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith . . . an instance of wrongdoing or waste to the employer or an appropriate authority." 43 Pa. Stat. Ann. § 1424(b). A plaintiff employee must also present some evidence of a causal connection between his or her report and the alleged retaliation. *Golaschevsky v.*

---

[7] Defendant RHD does not contest that it is an eligible employer subject to the statute.

*Dep't of Envtl. Prot.*, 720 A.2d 757, 759-60 (Pa. 1998). If a plaintiff satisfies these requirements, the burden shifts to the defendant employer to show its actions were lawful. *O'Rourke v. Dep't of Corrs.*, 778 A.2d 1194, 1200 (Pa. 2001). The defendant is not liable "if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." 43 Pa. Stat. Ann. § 1424(c).

Defendants move for summary judgment on the grounds that Plaintiff cannot show that (1) she reported a "wrongdoing" protected by the Whistleblower Law, (2) there was any causal connection between her report and her termination almost five years later, and (3) she was not fired for separate and legitimate reasons.

### 1. Wrongdoing

The Whistleblower Law does not protect every critical or damaging report that an employee may make to or about her employer—only those reports of a wrongdoing or waste within a narrower meaning of the statute are protected. A plaintiff who asserts a Whistleblower cause of action must specify how their employer is guilty of waste or wrongdoing. *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commonw. Ct. 1994), *aff'd*, 669 A.2d 335 (Pa. 1995). Wrongdoing is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Stat. Ann. § 1422.

Plaintiff argues that she made a good faith report of illegal activity, but she fails to specify how what she reported was illegal. Rather than addressing her report of Daniels, Plaintiff's Complaint alleges that Defendants violated the law by not taking action in response to her report.

Compl. ¶ 17; *see also* Compl. ¶ 33 (citing provision of Child Protective Services Law). Plaintiff did not, however, make a report internally or externally about Defendants' response to her report. Because Plaintiff never reported Defendants, their actions subsequent to her report are irrelevant in identifying the wrongdoing that she reported and for which she now seeks protection.[8]

Summary judgment is appropriate on this claim because Plaintiff has not identified a "wrongdoing" protected by the Whistleblower Law.[9] *See, e.g.*, *McClain v. Munn*, No. 06-278,

---

[8] The closest to an explanation of how Johnson reported an illegality is her assertion in her brief that "Ms. Daniels had sexual relations with a person defined as a child under the Child Protective Services Law." Pl.'s Resp. Mot. Summ. J. 68. Plaintiff fails to explain, however, how even the facts as she may have erroneously suspected them to be would constitute a violation of CPS. It is not obvious why Daniels could be accused of "child abuse" within the meaning of CPS by engaging in consensual sex with a seventeen-year-old boy not currently, or ever, in her custody. *See* 23 Pa. Cons. Stat. Ann. § 6303 (defining child abuse as an act by a "perpetrator" and defining "perpetrator" as "a parent of a child, a person responsible for the welfare of a child, an individual residing in the same home as a child or a paramour of a child's parent").

[9] The only potential "wrongdoing" suggested by the evidence is a violation of a RHD policy. When asked why she reported the rumor to her supervisor, Johnson explained that she thought an investigation was needed because "[i]t's against our company policies." Johnson Dep. 157:20-21; *see also id.* at 158:21-23. Plaintiff submits a one-page excerpt from an RHD handbook that states that employees should not have sexually physical or emotional relationships with consumers. Pl.'s Resp. Mot. Summ. J. Ex. W. However, Plaintiff does not put forth an argument that the RHD policy is a "code of conduct" within the meaning of the statute. It is unclear whether a Pennsylvania court would consider RHD's internal policy regarding employees' conduct with clients a "code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Stat. Ann. § 1422. *See generally Connor v. Clinton Cnty. Prison*, 963 F. Supp. 442, 451 (M.D. Pa. 1997) ("An internal Prison policy concerning the need for documentation is not a statute, regulation, ordinance, code of conduct, or code of ethics"). The record does not include enough facts for me to independently assess whether the policy falls within the purview of the statute. I lack information about RHD as an organization, the nature of its relationship to minors, the policy, and the purpose of the policy. While Defendants make some attempt to describe RHD and its mission in their Motion, *see* Defs.' Mot. Summ. J. 2-3, Plaintiff denies Defendants' characterizations related to these topics as having "nothing to do with the determination of Defendants' Motion for Summary Judgment," Pl.'s Resp. Mot. Summ. J. 5-6, ¶¶ 3-4; *see id.* ¶¶ 5-7.

2008 U.S. Dist. LEXIS 28985, at *11 (W.D. Pa. Apr. 8, 2008) (dismissing Whistleblower claim where plaintiff did not "put forth any argument in his brief in opposition to the motion to dismiss with respect to how the internet gambling would constitute 'wrongdoing'").

### 2. Causal Connection

To state a claim under the Whistleblower Law, a plaintiff must identify "'concrete facts' to connect the report" to her subsequent termination. *Golaschevsky*, 720 A.2d at 759 (quoting *Gray*, 651 A.2d at 225). A prima facie case requires more than evidence of the mere fact of a report followed by a termination. *Lutz v. Springettsbury Twp.*, 667 A.2d 251, 254 (Pa. Commw. Ct. 1995).

Johnson alleges in her Complaint that after her report, "Defendant Fishman began to view [her] in a negative light and subjected her to unfair and unwarranted scrutiny which continued up to her termination in 2009." Compl. ¶ 18. This allegation lacks specificity and has not been supported by evidence.[10] Plaintiff's unsupported suspicions are not enough to create an issue of material disputed fact regarding a termination that was almost five years after her report about a coworker. *See, e.g.*, *id.*; *Golaschevsky v. Dep't of Envtl. Res.*, 683 A.2d 1299, 1304 (Pa.

---

[10] In her brief, Plaintiff argues that her "not being offered promotions or the chance to interview for promotions" are examples of retaliation for her report. Pl.'s Resp. Mot. Summ. J. 21. Yet Johnson's own testimony reveals that she did not express interest in the two other positions until after they had been filled. Johnson Dep. 114:9-10, 116:5-117:5. She does not claim that the application process was meant to exclude her participation in particular: she complains that "we" did not know about the process and states that she does not believe anyone prevented her from getting the positions. *Id.* at 114:7-9, 119:10-120:22. There is no evidence that she was treated adversely with regard to these positions. *See, e.g.*, Hales-Slaughter Dep. 25:14-26:9; Pl.'s Resp. Mot. Summ. J. 7, ¶¶ 23-24 (admitting salary was increased at time she was denied other positions). Most importantly, there is no reason to think that these 2005 events bear any relationship to either her 2004 report or to her 2009 termination.

Commw. Ct. 1996) (finding no causal connection between report and termination four months later), *aff'd*, 720 A.2d 757 (Pa. 1998); *Drill v. Bethlehem-Center Sch. Dist.*, No. 03-692, 2006 U.S. Dist. LEXIS 27866, at *25 (W.D. Pa. Apr. 28, 2006) ("Absent any facts showing that the two events were related, the lapse of two years is simply too attenuated to create an issue of material fact."). I will grant Defendants' Motion as to the Whistleblower Law claim because Johnson has not produced any evidence of a nexus between the report she made in July 2004 and her termination in February 2009.

### B. Common Law Wrongful Discharge[11]

Plaintiff separately claims that her termination constitutes wrongful discharge under the Pennsylvania Child Protective Services Law and Whistleblower Law. Compl. ¶ 36.

Employment is presumed to be at-will in Pennsylvania, and employees may be fired for any or no reason in the absence of a statute or contract to the contrary. *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 176 (Pa. 1974). Pennsylvania courts have found a common law cause of action for wrongful discharge "in only the most limited of circumstances." *Clay v. Advanced Computer Applications*, 559 A.2d 917, 918 (Pa. 1989). "Where the termination has not implicated a clear mandate of public policy, [the Pennsylvania Supreme] Court and the Superior Court have not

---

[11] The Complaint lists three counts, titled (I) "retaliatory discharge," (II) "wrongful discharge," and (III) "Family Medical Leave Act." The nature and differences between the first and second counts are not immediately obvious. Defendants' Motion notified Plaintiff of the ambiguity. *See, e.g.*, Defs.' Mot. Summ. J. 25 ("Counts I and II of Plaintiff's Complaint appear to be mirror images of each other . . . ."). Plaintiff's response fails to explain the distinction between the claims, or describe the legal framework for each count.

11

permitted a common law cause of action for wrongful discharge." *Weaver v. Harpster*, 975 A.2d 555, 564 (Pa. 2009).

As previously discussed, Plaintiff has not identified how the Child Protective Services Law or Whistleblower Law is implicated by her termination. She certainly has not met the more demanding standard required to allow a common law cause of action for wrongful discharge. I will grant Defendants summary judgment on Plaintiff's wrongful discharge claim because Plaintiff has not shown that a clear mandate of public policy was implicated by her termination.

### C. Family Medical Leave Act

Plaintiff's third and final claim is that her termination violated FMLA. Compl. ¶ 45. She claims that her FMLA rights were violated when Defendants terminated her rather than restoring her employment at the conclusion of her medical leave.

FMLA provides employees with a right to take reasonable medical absences from employment. An employee is entitled to up to twelve weeks of leave a year if the employee has an eligible serious medical condition. 29 U.S.C. § 2612(a)(1)(D). Upon return, the employee is generally entitled to be restored to her former position, or an equivalent position. *Id.* § 2614(a)(1). This right to restoration is not absolute. The employee is not entitled to restoration after leave if the employee would not be in that position even if she had not taken leave. *Id.* § 2913(a)(3)(B). The Act also further limits the restoration rights of certain highly compensated employees, or "key employees."

FMLA provides employees with protection for exercising their statutory rights. An employee who believes these rights have been violated may assert a claim under either an

interference or retaliation theory of recovery. *See* 29 U.S.C. § 2615(a)(1) (prohibiting interference); 29 C.F.R. § 825.220(c) (prohibiting retaliation). To prevail on an unlawful interference claim, a plaintiff must show that (1) she was entitled to benefits under FMLA and (2) the employer denied those benefits. *Sarnowski v. Air Brooke Limousine*, 510 F.3d 398, 401 (3d Cir. 2007). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005). A plaintiff claiming that she was unlawfully retaliated against for exercising an FMLA right must show that (1) she invoked an FMLA right, (2) she suffered an adverse action, and (3) the adverse action was causally related to the plaintiff's exercise of FMLA rights. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508-509 (3d Cir. 2009).

Johnson appears to proceed under both theories.[12] Defendants apparently do not dispute that Plaintiff has shown a prima facie case of a violation under both theories, as they do not dispute that Plaintiff was entitled to FMLA leave, that she took FMLA leave, that she was terminated when she notified RHD that she intended to return from leave, and that she was denied restoration to an equivalent position. Instead, Defendants move for summary judgment on two affirmative defenses. First, they argue that Johnson's interference claim fails because she was not entitled to restoration due to the "key employee" exemption. Defs.' Mem. Supp. Mot. Summ. J. 22-23. Second, they argue that Plaintiff would have lost her job even if she had not

---

[12] That is, Defendants interfered with Johnson's FMLA rights by not restoring her to employment at the conclusion of her leave and/or Defendants retaliated against Johnson for taking leave by terminating her.

13

taken FMLA leave. *Id.* at 23-25. Defendants bear the burden on these arguments. *See* 29 C.F.R. § 825.216(a)(1) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004) (discussing how burden shifts to employer in retaliation claim to prove it would have fired the plaintiff even if not for FMLA leave). *See generally Colburn v. Parket Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335-46 (1st Cir. 2005) (collecting Courts of Appeals cases applying *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims).

### 1. Key Employee Exemption

Though employers must generally restore employees' employment after FMLA leave, the statute provides an exemption for salaried employees who are "among the highest paid 10 percent of the employees employed by the employer within 75 miles of the facility at which the employee is employed." 29 U.S.C. § 2614(b)(2). For these key employees, the statute allows employers to deny restoration of employment if:

> (A) such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer;
> (B) the employer notifies the employee of the intent of the employer to deny restoration on such basis at the time the employer determines that such injury would occur; and
> (C) in any case in which the leave has commenced, the employee elects not to return to employment after receiving such notice.

29 U.S.C. § 2614(b)(1). The inquiry of subsection A is not whether the employee's absence will cause injury, but whether restoration of the employee to the same or an equivalent position after

14

leave will cause the employer substantial and grievous economic injury. 29 C.F.R. § 825.218.

The exemption thus allows employers to deny restoration if they show two elements: that the employee was key and that restoration would cause substantial and grievous economic injury.

Defendants offer evidence on the first part of this defense: that Plaintiff was a key employee pursuant to § 2614(b)(2). Cooper Williams Dep. 4:16-7:6. As Plaintiff does not cite a single fact to contest Defendants' evidence on this classification, there is no genuine issue of disputed fact with regard to whether Johnson was a key employee.[13]

Defendants do not present evidence on the second part of the defense. Specifically, Defendants have not argued that RHD was justified in denying restoration of the Plaintiff to the same or equivalent position because to do so would have caused substantial and grievous economic injury to RHD. 29 U.S.C. § 2614(b)(1)(A). Defendants claim that Johnson's original position was not available upon her return; however, Defendants have not cited to anything to show that RHD believed it would have been economically injured by restoring Johnson to an equivalent position as FMLA requires. The Benefits Manager who designated Johnson as a "key employee" testified both that she did not make this determination and that, as a general matter, the Human Resources Department does not make decisions regarding restoration of key employees after medical leave. Cooper Williams Dep. 19:14-20:12. There is no documentation

---

[13] Defendants also offer evidence to show, and Plaintiff concedes, that Plaintiff received prompt notice of her categorization and its potential risks. Defs.' Mot. Summ. J. Ex. U (letter advising Johnson that she is a key employee and may be replaced during her leave); Johnson Dep. 242:13-15 (admitting receipt of the letter).

or testimony in the record that suggests another RHD employee determined that restoring Johnson to an equivalent position would be economically grievous.

It may be that Johnson was inadvertently terminated due to Gunter's mistaken understanding of the effect of Johnson's key employee designation. Gunter Dep. 65:6-7, 144:24-145:2, 146:2-4 (testifying that she believed Johnson was terminated by the letter informing Johnson that she was a key employee). Although FMLA allowed RHD to attempt to replace Johnson during her leave after giving her notice of her key employee status, her designation as a key employee did not alone terminate Johnson's employment, nor did the hiring of her replacement. Defs.' Mot. Summ. J. Ex. U (letter advising Johnson that she is a key employee and that if she is replaced and "if your reinstatement would cause a substantial and grievous economic burden . . . , RHD may deny your restoration . . ."); *see Kelly v. Decisionone Corp.*, No. 00-968, 2000 U.S. Dist. LEXIS 17508, at *5 (E.D. Pa. Dec. 6, 2000) ("This notification does not constitute termination as the employee is still entitled to work for the employer but the individual's original position may no longer be available.").

To successfully assert that Johnson's termination is exempted under the key employee provision of FMLA, denying restoration of Johnson to the same or an equivalent position must have been "necessary to prevent substantial and grievous economic injury" to RHD's operations. 29 U.S.C. § 2614(b)(1)(A). As Defendants bear the burden of showing the elements of a defense, I will deny summary judgment for Defendants on the defense based on the present record.

### 2. Same Decision Defense

Defendants also argue that Johnson was not entitled to restoration and was lawfully terminated because she would have been fired earlier if not for her FMLA leave.

An employee cannot use her right to FMLA leave to shield herself from an independently imminent termination. 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."). An employer will not be liable if it proves that the employee would have been terminated even if she had not requested and taken FMLA leave. *Id.*; *see Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 582 (5th Cir. 2006).

Defendants argue that Johnson's supervisors made a decision to terminate Johnson concurrent with Johnson's request to Human Resources for FMLA leave. The evidence, however, creates a genuine issue of material fact. Gunter, the RHD employee who fired Johnson, explained on a termination form that Johnson would not be rehired due to behavioral issues: "creating conflict with her managers in the months immediately preceding her disability." Defs.' Mot. Summ. J. Ex. Y. Johnson's alleged performance issues over previous months were apparently not contemporaneously documented, and Johnson denies both the behavior and ever having been disciplined prior to her termination. *E.g.*, Johnson Dep. 185:2-6, 196:1-197:20, 204:1-7. While there is undisputed evidence of a heated confrontation between Johnson and Fishman the day prior to her FMLA leave, Gunter actually fired Johnson and states that she was not instructed to terminate Johnson by anyone. Gunter Dep. 59:1-60:22. The conflicting

accounts of Johnson's performance between Defendants' witnesses and Johnson require a credibility determination that is inappropriate on a motion for summary judgment.

If Defendants can prove that Johnson would have been discharged if not for her request for FMLA leave, then Defendants will not be liable. This issue, however, implicates a disputed issue of material fact and therefore I will not grant summary judgment on this claim at this time.

**IV. CONCLUSION**

For the foregoing reasons, I will grant in part and deny in part Defendants' Motion for Summary Judgment. I will grant the Motion as to Plaintiff's state law claims and deny the Motion as to the Family Medical Leave Act claim.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                Copies **MAILED** on _____ to: